**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TYRONE WILLIAMS and JEROME McNEELEY, as Co-Independent Administrators for the Estate of DELORES McNEELEY, Deceased, et al.** ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) ) **No. 23 cv 1366** ) **(consolidated with 23 cv 1375 and 23 cv 1386)** ) | |
| **v.** ) ) | |
| **THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY, an Ohio Corporation,** ) ) ) ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

This case involves an insurance dispute between the administrators of the Estates of

Delores McNeeley, Gwendolyn Osborne, and Janice Reed, (collectively, "plaintiffs"), and insurer

Cincinnati Specialty Underwriters Insurance Company ("CSU"). In May 2022, Chicago

experienced a heat wave, and McNeeley, Osborne, and Reed all passed away due to heat

exposure in their respective units at the James Sneider Apartments, a building owned and

operated by the Hispanic Housing Development Corporation ("HHDC"). During the days

leading up to their deaths, HHDC declined to switch the James Sneider Apartments' HVAC

system to air conditioning mode due to a city ordinance that required the building to provide heat

until June and instead decided to turn off the heat, open windows, and provide residents with

fans. McNeeley, Osborne, and Reed later died in their apartments from heat exposure. The

parties now file cross motions for summary judgment in this declaratory judgment action to

1

determine how many "occurrences" caused the deaths.  (Dckt. ##54, 56).  For the reasons stated below, the Court grants CSU's summary judgment motion and denies plaintiffs' motion.

## I.     BACKGROUND

The parties submitted the following stipulated facts in support of their cross-motions for summary judgment.

### A.  The James Sneider Apartments

HHDC owns and manages multiple residential buildings within the city of Chicago, including the James Sneider Apartments, North & Talman Elderly Apartments, Cicero & George Apartments, North & Pulaski Elderly Apartments, and Teresa Roldan Apartments.  (Dckt. #53 ¶¶1, 2).  Delores McNeeley, Gwendolyn Osborne, and Janice Reed ("Decedents") lived at the James Sneider Apartments in May 2022.  (*Id.* ¶10).  The James Sneider Apartment building is an affordable housing development that requires the "principal applicant to be 55 years old or older," and no one under fifty years old may live in the building.  (*Id.* ¶11).  The James Sneider Apartment building, like all of HHDC's buildings, has a "binary HVAC system," meaning that the HVAC system can be in either heat mode or air conditioning mode, but cannot toggle between the modes without an HVAC professional's intervention.  (*Id.* ¶¶12–14).  Once an HVAC professional switches the HVAC system from one mode to the other, "it can take a full day for the system to fully adjust."  (*Id.* ¶15).

In May 2022, Chris Rodriguez was HHDC's Vice President of Property Management and he had the ultimate authority to order the HVAC systems to be switched from heating mode to air conditioning mode.  (*Id.* ¶¶3, 47).  According to emails exchanged between HHDC employees, a Chicago ordinance required the apartments to provide heat to residents until June 1.  (*Id.* ¶27).

**B. Unexpected Heat in May 2022**

In May 2022, Chicago experienced several days of unseasonably warm temperatures. Between May 10, 2022, and May 14, 2022, daily temperatures peaked between 86 and 91 degrees Fahrenheit. (*Id.* ¶17). At the James Sneider Apartments, the temperatures were as follows:

- 92 degrees on May 10, 2022.
- 91 degrees on May 11, 2022.
- 95 degrees on May 12, 2022.
- 93 degrees on May 13, 2022.
- 85 degrees on May 14, 2022.

(*Id.* ¶¶19–23).

**C. HHDC's Response to the Extreme Heat**

Between May 10 and May 14, 2022, HHDC received twenty-nine complaints concerning the high temperatures in the apartments. (*Id.* ¶42). On May 10, 2022, in response to tenant complaints at the North & Talman Elderly Apartments, Rodriguez asked HHDC's Chief of Maintenance about the HVAC system, to which the Chief of Maintenance responded:

> this is nothing new [in the North & Talman Elderly Apartments/Teresa Roldan Apartments/ James Sneider Apartments] . . . the buildings [in] May and September are the 2 hard months I would say to deal with temperatures. . . some days get hot and suddenly get cold again. As we know by City of Chicago ordinance, we [are] supposed to continue providing heat all month of May [in] the pas[t] we changed to coo[l]ing earlier and suddenly gets cold tenants start complaining that [they] are cold, [in] the pas[t] I let the property supervisor to decide if we do the changes earlier.

(*Id.* ¶29).

That same day, an HHDC employee emailed about the lack of air conditioning at the Cicero & George Apartments and advised that constituents were reaching out to the 31st Ward Alderman about the lack of air conditioning. (*Id.* ¶31). In addition to forwarding the email, Rodriguez wrote, "I know it's going to get cool again later in the week, is there anything we can

3

do to reduce the intensity of the heat right now? Please let me know." (*Id.* ¶33). HHDC's multi-site property manager responded that "[u]nless we complete the PM changeover, there is nothing we can do. Chillers are empty due to heat [mode]. . . . Please advise." (*Id.* ¶35). Rodriguez responded in the negative, saying "[n]o, it's going to be colder later in the week. I do know Israel has previously mention[ed] you can adjust the intensity of the heat. Can we lower the intensity of the heat but still keep [the] heat on?" (*Id.* ¶36).

On May 11, 2022, an HHDC employee based at the Teresa Roldan Apartments emailed various HHDC employees, including Rodriguez, to state that she contacted an HVAC professional to switch the Teresa Roldan Apartments' HVAC system to cooling mode. (*Id.* ¶39). Rodriguez responded:

> If you turn on the air conditioner, you will not be able to turn the heat back on. The low on Tuesday is going to be 52 degrees. With no heat, we will be in violation of the ordinance. Can we just turn the heat off so it doesn't make it hotter but not switch to AC?

(*Id.* ¶40).

> HHDC's director of property management operations chimed in as follows:
>
> I agree with you Chris. I recommend waiting a week or two more before scheduling the changeover. These "shoulder" seasons are always difficult. The next few days will be a bit uncomfortable, however we still have several days forecasted with highs in the 60's and lows in the 50's next week. I do not believe the building will retain enough heat from the daytime highs to keep it within City heat requirements.

(*Id.* ¶41). That same day (May 11, 2022), Rodriguez decided, after consulting with other HHDC staff, that HHDC would "turn the heat off, provide fans to circulate air, and open windows" at the HHDC buildings, rather than switch the HVAC system to cooling mode. (*Id.* ¶¶48–49). On May 12, 2022, four "portable HVAC units" were set up in community areas and, if requested, management would provide and install box fans for residents. (*Id.* ¶¶43, 56). On May 12, 2022,

4

the building turned off the HVAC system's heater boilers, but the air conditioning system was not turned on. (*Id.* ¶57).

### D. The Deaths

On May 14, 2022, three residents of the James Sneider Apartments were found deceased within their respective apartments. (*Id.* ¶60). Specifically, at approximately 10:14 a.m., HHDC received a call that Janice Lee Reed was not answering her phone and the HHDC janitor thereafter went to check on her in her apartment but found her deceased. (*Id.* ¶62). She had a fan in her unit, and the temperature was 87.6 degrees. (*Id.* ¶63). HHDC concluded that Reed "appeared to have passed away from natural causes and no foul play was believed." (*Id.* ¶66). At 3:10 p.m., a caregiver for Delores McNeeley found her unresponsive in her apartment and called the police. (*Id.* ¶67). She was "subsequently found to be deceased." (*Id.* ¶68). At approximately 3:34 p.m., HHDC made an emergency request to switch the James Sneider Apartment building's HVAC system to air conditioning mode. (*Id.* ¶75). Between 4:00 p.m. and 5:00 p.m., building staff began conducting wellness checks on all residents. (*Id.* ¶79). At approximately 6:45 p.m., Gwendolyn Osborne was found deceased in her apartment. (*Id.* ¶81).

Despite HHDC's previous conclusion that Reed died from "natural causes," post-mortem examinations concluded that all three Decedents died from "environmental heat exposure due to hot residential building during a heat-related weather event." (*Id.* ¶¶89–92).

### E. The Policy

CSU issued a liability policy to HHDC (the "Policy") for the period of January 1, 2022 to January 1, 2023. (*Id.* ¶93). The Policy provides coverage for "bodily injury" if the injury "is caused by an 'occurrence.'" (*Id.* ¶94). The Policy's definition of "bodily injury" includes death, and the Policy defines an "occurrence" as "an accident, including continuous or repeated

5

exposure to substantially the same general harmful conditions." (*Id.* ¶96). The Policy has an applicable limit of $1,000,000 for each occurrence, or $2,000,000 in the aggregate, although the aggregate limit was increased to $3,000,000 via amendment. (*Id.* ¶97). On January 3, 2023, the parties entered into a settlement agreement with others, whereby HHDC agreed to pay a total of eleven million dollars collectively to plaintiffs. (Dckt. #55 at 4–5 (citing Dckt. #22-1 (settlement agreement))). Included in that eleven million dollars was one million dollars[1] from the Policy and the parties agreed to litigate this declaratory action to determine whether additional payment is required. The only dispute before the Court is therefore how many "occurrences" caused Decedents' deaths.[2]

## II.     LEGAL STANDARD

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine

---

[1] Additional funds were included in the settlement from other policies between HHDC and CSU that are not at issue here.

[2] CSU notes that they only accept liability *arguendo* for the purposes of determining the number of occurrences and take no position as to whether HHDC does, in fact, have liability for the Decedents' deaths. (Dckt. #55 at 6 n.3).

dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## III. ANALYSIS

The parties dispute whether Decedents' deaths were caused by a single occurrence or by multiple occurrences. If the deaths were caused by multiple occurrences, CSU will be required to pay additional sums to plaintiffs in accordance with the Policy's aggregate limit. If the deaths were caused by a single occurrence, CSU will not owe any additional money to plaintiffs because it previously paid them $1,000,000. For the reasons that follow, the Court finds that Decedents' deaths were caused by a single occurrence.

### A. The Policy Is Not Ambiguous

As an initial matter, the Court first addresses the threshold issue of whether the Policy is ambiguous and concludes that it is not. If a policy's language is unambiguous, a court must interpret the policy according to the "plain, ordinary, and popular meaning." *Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 420 (7th Cir. 2005), *quoting Outboard Marine Corp. v.*

7

*Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992).  If a policy contains an ambiguous clause, the clause "must be construed in favor of the insured."  *Menke v. Country Mut. Ins. Co.*, 401 N.E.2d 539, 541 (Ill. 1980).

Plaintiffs asserts that the Policy "fails to set forth when an injury should be treated as multiple separate occurrences and when an injury is one general occurrence."  (Dckt. #57 at 5).  To reiterate, the Policy provides coverage for "bodily injury" if the "bodily injury" "is caused by an 'occurrence.'"  (Dckt. #53 ¶94).  Again, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* ¶96).  The Court rejects plaintiffs' effort to equate an injury to an occurrence because the Policy is clear that an injury is *not* an occurrence.  Rather, an occurrence is the *cause* of an injury, not the injury itself.  As such, plaintiffs are seeking to create ambiguity where a term ("occurrence") has already "acquired an established legal meaning."  *Ill. Nat'l Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 92 (Ill.App.Ct. 1989).

In addition, courts have repeatedly found this policy definition unambiguous.  In *Owners Ins. Co. v. Step Seven LLC*, No. 22 cv 50396, 2025 WL 2023279, at *3–4 (N.D.Ill. July 18, 2025), the court rejected the argument that "occurrence" was ambiguous where the policy was unclear "as to what constitute[d] a separate occurrence when an incident involves multiple deaths and/or injuries."  Noting that the defendants failed to provide any authority to support "their contention that the Policy's lack of a definition for a separate occurrence creates an ambiguity," the court found that "[n]othing in this definition is materially different from the definitions previously analyzed by Illinois appellate courts."  *Id.* (cleaned up).  Here, too, plaintiffs fail to cite any authority, and the Court declines to find "occurrence" ambiguous, in

line with previous cases. *See id.*; *Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 291 (Ill. 2006) (collecting cases); *Szczepkowicz*, 542 N.E.2d at 91.

**B. Under the Cause Theory, Decedents' Deaths Were Caused by One Occurrence**

"American courts have developed two basic approaches for assessing the number of occurrences that took place within the meaning of policies." *Nicor*, 860 N.E.2d at 287. Some jurisdictions, including Illinois courts, use the "cause theory" to determine the number of "occurrences" which took place under an insurance policy. *Nicor*, 860 N.E.2d at 287–88. Under the cause theory, "where each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence." *Id.* at 294. In contrast to the cause theory, other jurisdictions have adopted the "effect theory," which looks to "how many individual claims or injuries" resulted from an accident or occurrence. *Id.* at 287.

The Illinois Supreme Court provided the following hypothetical to differentiate between the two approaches:

> Assume that a motorist is traveling down a street lined with parked cars. Looking away from the roadway to change the station on his car's radio, the motorist allows his vehicle to wander. As a result, his car strikes the sides of three of the parked cars in succession, damaging each of them. The owners of the three damaged vehicles sue, and the vehicle owner seeks indemnification from his automobile insurance carrier. Under the effect theory, the fact that three cars were damaged and three claims were filed would mean that there were three "occurrences" for purposes of determining liability coverage, absent specific policy language to the contrary. Under the cause theory, on the other hand, the fact that the damage to all three vehicles resulted from the same conditions and was inflicted as part of an unbroken and uninterrupted continuum would yield the conclusion that there was only one occurrence.

*Id.* Because Illinois courts have adopted the cause theory to determine the number of occurrences that take place under a policy, the Court turns to the application of that theory to the facts here. *Id.* at 287–88.

9

The crux of the parties' dispute lies in what actions HHDC did or did not take in response to the May 2022 heat. Plaintiffs argue that Decedents' deaths constitute multiple occurrences under the cause theory, arguing that it would be "completely untenable" to find HHDC's conduct to be a single event because "each failure to turn on the air conditioning . . . represents its own occurrence." (Dckt. #57 at 10). Plaintiffs further contend there were, "at least, three separate occurrences," because the decision to not switch to cooling mode was "affirmatively made" on "multiple different occasions." (*Id.* at 3).

CSU, on the other hand, argues that Decedents' deaths were caused by a single occurrence: Rodriguez's May 11, 2022, decision "to not change over the HVAC system from heating mode to air conditioning mode." (Dckt. #55 at 6). Part of the parties' stipulated facts include that, on May 11, 2022, Rodriguez consulted with HHDC staff to decide that HHDC buildings would provide fans, turn off the heat, and open windows, instead of switching the HVAC system to air conditioning mode. (Dckt. #53 ¶¶48–49). According to CSU, this May 11, 2022 decision was the sole occurrence for which CSU is liable. For the following reasons, the Court agrees.

### i. The May 11, 2022 decision was an intervening act that increased HHDC's exposure to liability and constitutes one singular occurrence.

It is undisputed that Decedents' post-mortem examinations concluded that the extreme heat caused their deaths. (Dckt. #53 ¶¶89–92 (cause of death examinations)). Again, under the parties' policy, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Dckt. #53 ¶96). During the May 2022 weather event, Decedents were continually exposed to extreme heat and the cause theory focuses on intervening acts or acts that increase an insured's exposure to liability. *Ware v. First Specialty Ins. Corp.*, 983 N.E.2d 1115, 1119 (Ill.App.Ct. 2013). Rodriguez's May 11,

10

2022 decision to provide fans and open windows was an intervening human act that increased the insured's exposure to liability because his decision did not call for action that would have sufficiently cooled the building (i.e., switching the HVAC system to air conditioning mode) and thereby saved the lives of Decedents. Ultimately, Rodriguez and HHDC made the wrong decision, but their decision to provide fans, turn off the heat, and open windows (instead of switching the HVAC system to air conditioning mode) was singular insofar that there were no further "separate and intervening" acts that thereafter increased HHDC's exposure to liability, and plaintiffs' attempt to assert otherwise is unavailing, *see infra* at III.B(iii).

Indeed, case law supports the conclusion that there was only one single occurrence. In *United Conveyor Corp. v. Allstate Ins. Co.*, 92 N.E.3d 561, 570 (Ill.App.Ct. 2017), and *U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1259 (Ill.App.Ct. 1994), courts found a single occurrence from the continuous production of asbestos containing products. In *Gypsum*, there were over 200 property damage claims stemming from Gypsum products in schools and other public buildings. 643 N.E.2d at 604. In *Allstate*, thousands of individuals filed claims alleging injuries from asbestos exposure. 92 N.E.3d at 564. In both cases, there was no separate human intervening act attributable to the products' installation or maintenance. *Id.* at 570; *Gypsum*, 643 N.E.2d at 1257; *Travelers Prop. Cas. Co. of Am. v. RSUI Indem. Co.*, 844 F.Supp.2d 933, 936 (N.D.Ill. 2012) (two E. coli cases caused by single occurrence of manufacturer producing a batch of tainted meat); *Scottsdale Ins. Co. v. Robertson*, 788 N.E.2d 279, 282 (Ill.App.Ct. 2003) (single occurrence where two individuals died and two more were injured from carbon monoxide exposure allegedly caused by maintenance issues in their apartment, including issues with the heating system).

11

*Ware v. First Specialty Ins. Corp.*, 983 N.E.2d 1115 (Ill.App.Ct. 2013) provides another example of a single occurrence. There, a residential building's third-floor porch collapsed, falling onto the lower floors and causing their porches to collapse, killing twelve and injuring more. *Id.* The court held that the porch collapse constituted a single occurrence under the cause theory, even though some of the individuals' injuries did not manifest until days or weeks later. *Id.* at 1117, 1121.

Returning to the James Sneider Apartments, the parties agree that HHDC (namely, Rodriguez) decided that the HVAC system would not be switched to cooling mode. Although, as explained below, they disagree on the date that this was first decided, there is no dispute a decision was made to not switch the HVAC system prior to the deaths of the Decedents. After deciding to not switch the HVAC system to cooling mode, Decedents were subjected to "continuous or repeated exposure to substantially the same general harmful condition[]"—i.e. extreme heat. HHDC took an affirmative singular action in providing certain accommodations instead of switching the HVAC system to air conditioning mode, and this action exposed CSU to liability.

### ii. There were no separate or intervening acts to constitute additional occurrences.

Plaintiffs argue that, between May 10, 2022 and May 14, 2022, HHDC "affirmatively decided" via "several separate actions" to not turn on the air conditioning, "which in turn exposed the Plaintiffs to an increased risk of harm and eventual death." (Dckt. #57 at 9). Plaintiffs, however, fail to persuasively point to any such "separate actions" to support such a conclusion. Instead, they point first to HHDC being "aware" of extreme heat in their residential buildings throughout Chicago beginning on May 10, 2022, (Dckt. #57 at 7). But being "aware" of heat is not an "occurrence" under the cause theory. Plaintiffs do not attempt to explain, nor

12

could they, how a general awareness of extreme heat constitutes a "separate and intervening human act, whether negligent or intentional," or otherwise "increased the insured's exposure to liability." *Nicor*, 860 N.E.2d at 294. Indeed, the cause theory deals with *affirmative acts* and being aware of weather conditions is not an affirmative act. *See Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 754 (Ill. 2009) (collecting cases applying the cause theory and discussing their affirmative acts).

Next, plaintiffs point to Rodriguez making an "express decision" on May 10, 2022 "not to switch to air conditioning and to keep the heating system" turned on. (Dckt. #57 at 7 (citing #57-1 at 30)). In support of this purported "separate action," plaintiffs cite Rodriguez's deposition testimony. His deposition testimony, however, merely states that Rodriguez was the "ultimate decision-maker" with "final say on whether to switch the buildings over to the AC," and says nothing about any "express decision" that was or was not made on May 10, 2022. (Dckt. #57-1 at 30). The Court therefore finds there is no evidence in the record to support the assertion that Rodriguez made an "express decision" on May 10, 2022 that would constitute a "separate and intervening act," constituting an additional occurrence under the cause theory.

Plaintiffs further point to the May 11, 2022 emails from Rodriguez and HHDC's director of property management operations that "made the decision that they would not be switching to an air conditioning system and prevented [an HHDC employee at the Teresa Roldan Apartments] from providing relief to her residents." (*Id.* at 7–8). Again, the referenced emails state the following. On May 11, 2022, an HHDC employee based at the Teresa Roldan Apartments emailed:

> I just want to inform you that we have been receiving many calls and office visits regarding the high heat in the units/building here at Teresa Roldan, I have contacted Premier Mechanical to see if they can come to the property as soon as possible to turn on the A/C and they will try to be here today for this urgent service need.

13

(Dckt. #52 ¶39).  Rodriguez responded:

> If you turn on the air conditioner, you will not be able to turn the heat back on.  The low on Tuesday is going to be 52 degrees.  With no heat, we will be in violation of the ordinance.  Can we just turn the heat off so it doesn't make it hotter but not switch to AC?

(*Id.* ¶40).  The HHDC director of property management operations then responded to the email chain:

> I agree with you Chris.  I recommend waiting a week or two more before scheduling the changeover.  These "shoulder" seasons are always difficult.  The next few days will be a bit uncomfortable, however we still have several days forecasted with highs in the 60's and lows in the 50's next week . I do not believe the building will retain enough heat from the daytime highs to keep it within City heat requirements.

(*Id.* ¶41).

These emails do not reflect any affirmative acts that would change the course already set in motion by Rodriguez's earlier decision on that same day.  In other words, the emails only reaffirmed, and did not change, the prior decision to not switch the HVAC system to air conditioning mode.  Furthermore, plaintiffs' reliance on *Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.*, 685 N.E.2d 932, 938 (Ill.App.Ct. 1997), which they cite for the proposition that "revisiting" a decision to not supervise an employee can lead to multiple occurrences, is misplaced.  In *Roman Catholic Diocese*, the court suggested that, if a church employee is warned that a priest abused a minor and does nothing to prevent the priest from committing further abuse, subsequent abuse constitutes a second occurrence once the priest abuses another minor.  *Id.* at 938.  However, for the facts here to be analogous to *Roman Catholic Diocese*, the record would have to show that: (1) HHDC was aware of a death caused by the heat; (2) HHDC decided not to revisit its decision to switch the HVAC system to air

14

conditioning *after* learning of the death; and (3) one or more additional deaths due to the heat subsequently occurred.

But the undisputed record here shows that HHDC did not become aware of any of Decedents' deaths until May 14, 2022, at which point they submitted an emergency request to switch the HVAC system to air conditioning mode (although it was, tragically, already too late for Decedents). (Dckt. #53 ¶75). As such, this situation is more akin to *Dental Experts, LLC v. Mass. Bay Ins. Co.*, No. 20 CV 5887, 2022 WL 2528104, at *3–4 (N.D.Ill. July 7, 2022), where "[n]o reasonable factfinder could construe an executive order that flows from a prior order by the same authority," i.e., a "renewal," "as a separate occurrence, as that order was causally dependent on the original order requiring closure." Here, any subsequent decisions that recommitted to the original May 11, 2022 decision to provide fans, turn off the heat, and open windows instead of switching the HVAC system to air conditioning similarly did not constitute separate "occurrences" under the Policy.

Next, plaintiffs cite the twenty-nine customer complaints received by HHDC between May 10, 2022 and May 14, 2022 for support of separate intervening acts constituting multiple occurrences. (*Id.* at 8). Like the emails noted above, however, the twenty-nine customer complaints do not provide any evidence of separate or intervening acts. Further, the stipulated facts provide that, if a resident requested, HHDC would provide residents with a fan and install it. (Dckt. #53 ¶43).

Finally, plaintiffs contend that, had HHDC "chosen to turn on the air conditioning, which they could have, on May 11, 2022, they knew the building would have reached a moderate temperature by May 12, 2022;" had they changed to air conditioning on May 12, 2022, "they knew the building would have reached a moderate temperature by May 13, 2022;" and had they

15

changed to air conditioning on May 13, 2022, "they knew the building would have reached a moderate temperature by May 14, 2022. " (Dckt. #57 at 9). Plaintiffs' argument falls short because it relies on hypothetical decisions that HHDC could have taken when the record provides evidence of a concrete affirmative decision on May 11, 2022 to not switch the HVAC system to air conditioning mode and instead take another course of action by providing fans, opening windows, and turning off the heat.

The cases upon which plaintiffs rely do not support a finding of multiple occurrences, and none them present a situation analogous to the one in the present case. In *Mason v. Home Ins. Co. of Illinois*, 532 N.E.2d 526, 529 (Ill.App.Ct. 1998), for example, the court found an occurrence every time a restaurant sold a sandwich containing toxic meat to a customer because each sale exposed the insured restaurant to liability. In particular, "[t]here was not an uninterrupted and continuing cause from which all of the injuries resulted," and no liability existed until the restaurant served a portion of the contaminated food. *Id.* Here, on the other hand, there was an uninterrupted and continuing cause from which all of the injuries resulted.

Along these lines, the Illinois Supreme Court found multiple occurrences where 195 clients suffered mercury contamination in *Nicor* after Nicor employees spilled mercury while replacing old mercury-filled gas regulators. *Nicor*, 860 N.E.2d at 294. The Supreme Court rejected the insurer's argument that the manufacture of the mercury-filled gas regulators was a single occurrence because liability "did not arise from any inherent defect in the old-styled gas regulators," "the manner in which they were installed," or "any systemwide policy or procedure regarding the methodology employed for removing the regulators." *Id.* at 295. Rather, liability arose when mercury spilled," which required a human act during each of the replacements, occurring in only .05% of the homes. *Id.* Here, plaintiffs cannot point to multiple events from

16

which liability arose. By contrast, when faced with the decision to switch the HVAC system to air conditioning mode, HHDC declined to do so. All injuries flowed from that decision and there were no intervening acts which increased liability.

In another inapposite case, *Ill. Nat'l Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 92–93 (Ill.App.Ct. 1989), the court found two occurrences where two cars hit a tractor-trailer. The tractor-trailer partially blocked traffic, precipitating the first collision. The tractor-trailer then drove forward approximately twelve feet, unblocking one lane of traffic but continuing to block other lanes. *Id.* at 93. Five minutes later, the second car struck the tractor-trailer. *Id.* The "failure to remove his vehicle completely, which was still operable, from the northbound lanes after the first accident created a different set of conditions and constituted a separate cause of the second collision." *Id.* Thus, it was a second negligent act *after* the first collision (namely, the tractor-trailer's driver's decision to move the tractor-trailer) that created a second occurrence prior to the second collision.

The Seventh Circuit later distinguished *Szczepkowicz* from another case involving a traffic collision. *Auto-Owners Insurance Co. v. Munroe*. 614 F.3d 322, 325–26 (7th Cir. 2010). In *Munroe*, two trucks collided and then the first truck, out of control, hit a third truck head on. *Id.* The Seventh Circuit concluded that the case differed from *Szczepkowicz* because "[u]nlike *Szczepkowicz*, this case does involve a single force and an uninterrupted chain-reaction involving several vehicles, and thus a single continuous occurrence." *Id.* at 326. "Although there may have been several causes for the uninterrupted events, none of these causes occurred after the force that caused the injury had been set in motion. In other words, even if the causes could properly be called separate, none were *intervening* causes." *Id.*

Here, *Munroe* is more instructive than *Szczepkowicz*. In *Szczepkowicz*, the tractor-trailer's failure to fully move out of traffic was an intervening negligent action that altered the conditions leading up to the second traffic collisions. At the James Sneider Apartments, there was no such intervening action that changed the apartment building's conditions. Indeed, the deaths resulted because the apartment conditions *did not change*—Decedents remained exposed to extreme heat. The Court is not persuaded by plaintiffs' attempt to parse out such continuous exposure into various segments and thus rejects plaintiffs' contention that Decedents' deaths were caused by multiple occurrences.

**C. The "Time and Space" Test Exception to the Cause Theory Is Inapplicable**

Finally, plaintiffs ask the Court to apply the "time and space" test, an exception to the cause theory, which has been used in a single case. *See Addison*, *supra*, 905 N.E.2d 747. The Court declines plaintiffs' request to do so.

In *Addison*, a landowner negligently failed to secure his property, leading to the deaths of two young boys who fell and became trapped in a sand- and water-filled excavation pit. *Id.* The court declined to apply the cause theory because, "in situations where a continuous negligent omission results in [separate] insurable injuries," such as the landowner's historical failure to secure his property, "some limiting principle must be applied." *Id.* at 755. The Illinois Supreme Court thus created the time and space test. Under that test, "[w]here negligence is the result of an ongoing omission rather than separate affirmative acts," injuries will be deemed the result of a single occurrence only if the "cause and result are simultaneous or so closely linked in time and space as to be considered by the average person as one event." *Id.* at 756. In *Addison*, the insurer could not meet its burden of proving that the boys' deaths were so closely linked as to be considered one event because police investigators could not determine how closely in time they

became trapped, although investigators concluded that one boy attempted to help the other and became trapped himself. *Id.* at 750, 756–57. Therefore, because the timing of the deaths was unknown, the Court declined to find that the deaths were "simultaneous or so closely linked in time and space" and determined that they constituted two occurrences. *Id.*

Plaintiffs argue here that the Court can reasonably infer that "it would be nearly statistically impossible for all three [Decedents], in three separate apartments, to have died in the exact same moment on the exact same day," so that "no average person would consider all three deaths to be *so* simultaneous that they were one event," and therefore they must be treated as separate occurrences. (Dckt. #62 at 8–9). *Addison*, however, did not establish "any minimum amount of time between injuries required for application of the time and space test." *Step Seven LLC*, 2025 WL 2023279, at *7 (rejecting argument that injuries must be simultaneous to be considered one occurrence).

CSU, on the other hand, argues that the time and space test is not relevant to Decedents' deaths because Decedents died after HHDC affirmatively acted, instead of in response to an ongoing negligent omission. (Dckt. #55 at 14–15). In the alternative, CSU argues that the deaths would nonetheless be deemed the result of one occurrence under the time and space test because the cause of deaths is undisputed, unlike in *Addison*, and the average person would consider them so closely linked as to be one event. (*Id.*).

Here, there was no negligent omission that would trigger the time and space test. Whereas *Addison* involved a landowner's historical failure to secure his land, i.e., omitting to do anything, here HHDC decided to take action (namely, providing fans, opening windows, and turning off the heat) in lieu of switching the HVAC system to air conditioning mode. HHDC affirmative negligent act in choosing the wrong course of action on May 11, 2022 did not amount

19

to a ongoing negligent omission that triggers the application of the time and space test. *See Addison*, 905 N.E.2d at 754 ("A significant distinction between *Nicor* and the instant case is that *Nicor* primarily discussed affirmative acts of negligence rather than an ongoing negligent omission.") & at 756 (holding that the time and space tests applies "[w]here negligence is the result of an ongoing omission rather than separate affirmative acts").

Other courts have similarly declined to apply the time and space test where there was a discrete negligent act at issue. *See RSUI*, 844 F.Supp.2d at 936 (declining to apply *Addison* because "the negligence asserted against Valley Meats is a discreet act—the production of a single batch of tainted meat"); *Ware*, 983 N.E.2d at 1122–23 ("[T]he present case, unlike *Addison*, is not a case in which multiple injuries were sustained over time due to an ongoing negligent omission" but even if *Addison* applied, injuries were still caused by one occurrence because it was undisputed that porch collapse caused all injures, even though some did not manifest until days or weeks later.); *Certain Underwriters at Lloyd's, London v. Chi. Bridge & Iron Co.*, 406 S.W.3d 326, 336 (Tex.App. 2013) (declining to apply time and space test where asbestos exposure claims arose out of single occurrence).

In sum: because HHDC performed an affirmative negligent act and did not have an ongoing negligent omission, the time and space test is inapplicable. Decedents' deaths were thus caused by one occurrence within the meaning of the Policy under the cause theory and Decedents' deaths are therefore subject to the Policy's $1,000,000 per-occurrence limit.

20

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment, (Dckt. #54), is granted and plaintiffs' motion for summary judgment, (Dckt. #56), is denied.

**Date: March 27, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

21